**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE**

| | | | |
|---|---|---|---|
| SIDDARTH SHAH and DAKSHA SHAH, | ) | | |
| d/b/a YERA'S RACEWAY, | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | | |
| v. | ) | No.: | 3:99-cv-410 |
| | ) | | (VARLAN/SHIRLEY) |
| RACETRAC PETROLEUM COMPANY, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## MEMORANDUM AND ORDER

On August 27, 2004, the jury, after a two-week trial, returned a verdict in favor of plaintiffs pursuant to their claims for: (1) promissory estoppel; (2) breach of contract as orally modified; and (3) violations of the Tennessee Consumer Protection Act (TCPA), Tenn. Code Ann. § 47-18-109. The jury further determined that the plaintiffs suffered identical damages of $50,456 under each of these claims. The jury also returned a verdict in defendant's favor with respect to plaintiffs' claims for intentional misrepresentation and promissory fraud. Additionally, the jury determined that plaintiffs were not entitled to any punitive damages.[1] Finally, the jury returned a verdict in defendant's favor on its counterclaim for conversion in the requested amount of $8,645.75.

---

[1]The jury was instructed that they could not award punitive damages unless they found in plaintiffs' favor either on their theory of intentional misrepresentation or on promissory fraud (or both). Because the jury found in defendant's favor on those two issues, the jury was, in effect, required to return a defense verdict on punitive damages.

This matter is presently before the Court on the following motions:

(1)     Plaintiffs' motion to treble the jury's verdict pursuant to the TCPA [Doc. 174];

(2)     Plaintiffs' motion for attorney fees and costs pursuant to the TCPA [Doc. 175]; and

(3)     Defendant's motion for judgment as a matter of law or, alternatively, to amend the judgment or for a new trial [Doc. 193].

The issues raised with respect to plaintiffs' motions have been exceptionally well briefed by the parties [*see* Docs. 174, 175, 177, 179, 181, 182, and 197;  *see also* Docs. 178, 196, and 198].[2]   The Court also heard extensive oral argument on January 19, 2005, regarding plaintiffs' motions.[3]  For the reasons that follow, the Court will grant plaintiffs' motion to treble the jury verdict under the TCPA only to the extent that the verdict will be doubled; further, the Court will grant plaintiffs' motion for attorney fees and costs pursuant to the TCPA in the amount of $232,597.32;  and finally, the Court will deny defendant's motion in its entirety.

---

[2]No briefs have been filed as to defendant's motion pursuant to this Court's order staying the briefing schedule until after the parties had concluded their mediation of all post-trial issues [*see* Doc. 195].  Nevertheless, as will be discussed in more detail shortly, there is no need for further briefing on the issues raised in defendant's motion as it would, from the Court's view, result in an unnecessary use of counsels' time and needless expenditure of their clients' money.  It is simply time for this litigation, at least in this Court, to come to an end.

[3]Plaintiffs' motions were not, however, ripe for adjudication until August 8, 2005, when plaintiffs filed their reply to defendant's response to their supplement to their motion for attorney fees and costs [*see* Doc. 198].  All of this delay was primarily predicated on allowing the parties sufficient time to explore mediation in a post-trial landscape which, unfortunately, had no more success than the parties' efforts to settle this litigation immediately prior to trial [*see* Doc. 195].

2

# I.

## *Motion to Treble Jury Verdict Under the TCPA*

Plaintiffs' first motion is based on the following language from the TCPA:

> If the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper.

Tenn. Code Ann. § 47-18-109(a)(3). The TCPA defines "knowing" as follows:

> ... "knowing" means actual awareness of the falsity or deception, but actual awareness may be inferred where objective manifestations indicate that a reasonable person would have known or would have had reason to know of the falsity or deception[.]

Tenn. Code Ann. § 47-18-103(6). The TCPA does not define the term "willful." Nevertheless, in conjunction with this specific subsection of the TCPA, it has been observed that "'[a]n act is willfully done if done voluntarily and intentionally and with a specific intent to commit such an act.'" *Smith Corona Corp. v. Pelikan, Inc.*, 784 F. Supp. 452, 484 (M.D. Tenn. 1992) (quoting the court's jury instructions with respect to determining whether defendant's conduct was "willful" under Tenn. Code Ann. § 47-18-109(a)(3));[4] *see also Akers v. Bonifasi*, 629 F. Supp. 1212, 1223 (M.D. Tenn. 1984) ("'willful' means nothing more than intentional" with respect to the TCPA).

---

[4]Here, by contrast, the parties did not request that the issue of willfulness be submitted to the jury. *See, e.g.,* Doc. 169-2 (defendant's proposed verdict form). Thus, the parties and the Court had always anticipated that if the jury returned a verdict in favor of plaintiffs on their TCPA claim, the Court would determine whether the jury's award of damages should be enhanced.

3

The TCPA itself provides considerable guidance to a trial court in determining whether an award of actual damages should be trebled:

. . .

(4)     In determining whether treble damages should be awarded, the trial court may consider, among other things:

(A)     The competence of the consumer ... ;

(B)     The nature of the deception or coer-cion practiced upon the consumer ... ;

(C)     The damage to the consumer ... ;  and

(D)     The good faith of the person found to have violated the provisions of this part.

Tenn. Code Ann. § 47-18-109(A)(4).  Because the statute uses the discretionary "may" in identifying these factors, a court is not required to consider them.  This Court is of the opinion, however, that these factors are extremely useful in analyzing the present case, and they will be given due consideration.  Moreover, this list is not, by its very terms, all-inclusive; thus, this Court may consider other factors, if appropriate.  Finally, the Court notes that the TCPA is to be liberally construed to protect consumers and others from those who engage in deceptive acts or practices.  Tenn. Code Ann. § 47-18-102(b);  *Akers*, 629 F. Supp. at 1222 (quotations and citations omitted);  *Morris v. Mack's Used Cars*, 824 S.W.2d 538, 540 (Tenn. 1992).

The first determination to be made by the Court under the TCPA is whether defendant engaged in the unfair or deceptive act in a "willful or knowing" manner.  Or, to put it another

4

way, did the defendant intend to deceive or engage in an unfair practice with respect to plaintiffs? *See Menuskin v. Williams*, 145 F.3d 755, 768 (6th Cir. 1998) ("the TCPA language provid[es] for treble damages only when the added element of intent is present ... ."). Here, defendant contends that the jury verdict itself provides a straightforward, negative response to this question. Defendant argues that because the jury returned a verdict in its favor as to plaintiffs' causes of action for intentional misrepresentation and promissory fraud, the jury by implication determined that defendant did not intend to deceive plaintiffs. Consequently, according to defendant, this Court cannot now make a determination contrary to the jury's implicit finding by declaring the defendant's actions were willful or knowing. Most certainly, the Court acknowledges that had the jury returned a verdict in plaintiffs' favor on either one or both of these intentional tort theories, the Court's job at this juncture would be almost perfunctory as such a verdict would have virtually compelled a judicial determination that defendant demonstrated the requisite intent to deceive under the TCPA.

However, the Court is not persuaded that the converse is also true. Said otherwise, the jury's finding in favor of the defendant with respect to intentional misrepresentation and promissory fraud does not by itself negate a finding of the requisite intent contemplated by the TCPA. Rather, the Court is still statutorily required to independently analyze defendant's conduct in the context of the four factors set forth above and any others which the Court deems appropriate to determine whether treble damages should be awarded. Contrary to defendant's insistence, there is no prerequisite in the TCPA for plaintiffs to prove fraud in

order to recover treble damages.  The only preliminary requirement is that the plaintiffs

prove, as has been done in this case, that a violation of the TCPA did, in fact, occur.

The TCPA proscribes "representing that a consumer transaction confers or involves

rights, remedies, or obligations that it does not have or involve."  Tenn. Code Ann. § 47-18-

104(12).  Additionally, the TCPA prohibits "[e]ngaging in any other act or practice which

is deceptive to the consumer or to any other person."  *Id.* at § 47-18-104(27).  The scope of

the TCPA includes "the advertising, offering for sale, lease or rental  ...  of any goods,

services, property, tangible or intangible, real, personal or mixed."  *Id.* at § 47-18-103(9).

Here, even if the Court ignores all of the proof regarding defendant's assurances and

representations *before* the various agreements were executed (consistent with the jury's

verdict in favor of the defendant on plaintiffs' intentional misrepresentation and promissory

fraud claims), there is still sufficient proof in this record to find knowing and willful

violations of the TCPA *after* the agreements were executed (equally consistent with the

jury's verdict in favor of the plaintiffs on their claims of promissory estoppel and breach of

contract as orally modified).  Specifically, plaintiffs introduced proof that shortly after the

agreements were executed, Floyd Philpot, defendant's general manager, made the same

assurances to plaintiffs as had J. D. Main, defendant's district manager, that Racetrac would

not utilize the thirty-day termination clause as long as plaintiffs were performing

satisfactorily.  Yet, defendant regularly used these termination clauses to extinguish an

operator's rights when defendant sold Raceway locations.  In fact, three days after the

closing, Jackie Russell, asset manager in defendant's real estate department, mailed a bid

6

package of Raceway stores, including the one at issue, Raceway 773, to an interested purchaser. Therefore, defendant's assurances to plaintiffs to the contrary were at best deliberately misleading and at worst intentional untruths. Either way, the representations were willful and knowing.

Even more telling, after becoming operators, and with the defendant's approval, plaintiffs continued to invest money in the business, including installation of a surveillance system, improvement to the coolers, increased inventory, and cutting an overhang wall. James Smith, who assumed Main's corporate role after his departure, informed the plaintiffs on at least two different occasions that they had a satisfactory performance history and that they did not need to worry about defendant terminating them. These statements, plaintiffs contended at trial, encouraged plaintiffs to continue making improvements to the store. Obviously, this proof as to what occurred after the parties entered into the initial agreements made a tremendous impact upon the jury because the jury's damage award was consistent with the investment plaintiffs made to Raceway 773 in spite of these now obvious misrepresentations.

It must also be emphasized that Philpot testified that had he known that Raceway 773 was for sale at the time the agreement was being consummated, he would have made this fact known to Mr. Shah and clarified his statements concerning the thirty-day clause. Again, there is ample proof in this record to suggest that Racetrac knowingly prevented its field personnel from being aware of its attempts to sell these properties, including specifically Raceway 773. As noted by the Sixth Circuit when discussing the attempted sale of Raceway

7

773 three days after the closing, "Russell instructed [the potential buyer] that when 'visiting the stores please use discretion as our field employees or our Contract operators are not aware of this offering.'" *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 565 (6th Cir. 2003). Thus, there is proof in this record to demonstrate that the defendant's agents and employees knew that the thirty-day clause would be used to terminate its contract operators in spite of assurances by its field personnel to the contrary. Defendant can no longer escape the consequences of its intentional acts and omissions. The Court finds, therefore, that plaintiffs have proven that the defendant's conduct was "willful [and] knowing" as contemplated by the TCPA because defendant represented that the lease at issue conferred a "right[] ... that it [did] not have ..." *see* Tenn. Code Ann. § 47-18-104(12) by advising the plaintiffs that the thirty-day termination clauses would not be utilized as long as plaintiffs performed satisfactorily when that representation was simply untrue.

The Court will turn next to the statutory factors which may be considered. The first factor is the competence of the consumer. In this case, it is undisputed that both plaintiffs had advanced degrees and had financially successful careers in their respective areas of professional expertise, Mr. Shah as an engineer and Mrs. Shah in banking and bookkeeping. However, the proof is also undisputed that this instance was the first time that plaintiffs had purchased a business or entered into a lease agreement and contract of this nature. Even so, the plaintiffs were constantly concerned about the thirty-day termination clause and the circumstances under which it might be employed. For that reason, the plaintiffs often asked the defendant's representatives and other contract operators about the clause before, during,

8

and after the initial agreements were executed, and the plaintiffs were assured by defendant's representatives that those clauses would not be employed as long as they performed satisfactorily. In the Court's view, the defendant took advantage of the plaintiffs' business naivete. Consequently, the first factor weighs in favor of the plaintiffs.

The second factor is the nature of the deception or coercion practiced upon the consumer. Here, the deception by the defendant is that it would not utilize the thirty-day termination clause for any reason except for the plaintiffs' poor performance. Yet, plaintiffs introduced proof that the defendant regularly used these termination clauses to remove operators when defendant wished to sell the property, contrary to its representations to plaintiffs. Defendant's deception regarding the use of these termination clauses goes to the very heart of this case. The second factor thus weighs in favor of the plaintiffs.

The third factor is the damage to the consumer. Obviously, the jury's verdict of $50,456 represents some of that damage. Other economic damage to plaintiffs includes the enormous amount of attorney fees generated by this litigation which plaintiffs have been paying for the last nine years. Moreover, the Court cannot ignore the fact that these plaintiffs have been embroiled in - if not consumed by - this litigation for nearly a decade after entering into the agreements at issue.[5] Therefore, it is logical to conclude that Plaintiffs have indeed been damaged, emotionally and financially. Therefore, this factor also weighs in favor of the plaintiffs.

---

[5]Plaintiffs filed their first lawsuit on December 9, 1996, in the Circuit Court for Blount County, Tennessee [*see* Doc. 1, attachment, in 3:97-cv-255].

Finally, the Court must consider the good faith of the person found to have violated the TCPA. Defendant's position is, of course, that it did nothing that the agreements at issue did not allow. Again, either party was given the right to terminate the agreement upon thirty-days notice to the other. From that standpoint, it could be argued that the defendant operated in good faith because it did nothing more than was specifically allowed under the contract and lease. However, it can be argued with equal force that the defendant deliberately misled plaintiffs as to when the thirty-day clause would be utilized. There is more than sufficient proof in this record that the defendant had previously used these thirty-day termination clauses to remove operators when it wished to sell its property and that it was surreptitiously offering the subject property for sale three days after the parties entered into the contract and lease. Under these circumstances, any good faith on the part of the defendant totally evaporates.

Furthermore, any good faith of the defendant is belied completely by the defendant's own conduct regarding the sale of Raceway 773. Even though defendant's Chief Executive Officer Carl Bolch testified at trial that Raceway 773 was essentially a mistake purchase and a poor performer from the very outset, *i.e.*, "an underperforming store that was getting worse" [*see* Doc. 190, p.1289], neither plaintiffs nor any of the other former operators were ever informed by defendant that it was for sale. Rather, plaintiffs were not told of the purchase until after defendant had negotiated and accepted a contract to purchase Raceway 773. The termination notice received by plaintiffs gave them only thirty days to leave the premises and made no mention of any opportunities to buy any alternative locations except

10

for one which was in Alabama and would have required plaintiffs to make an additional purchase from another operator. Nor were plaintiffs given the purchaser's name (Downey Oil) or contact information. Additionally, defendant never discussed the possible purchase of any of plaintiffs' inventory or equipment with Downey Oil or relieved its representatives from their obligation of confidentiality to permit them to have pre-closing discussions with the plaintiffs. In short, defendant made it extremely difficult for plaintiffs to protect their investment and interest in the location after it agreed to sell Raceway 773 to Downey Oil. All of this evidence undermines defendant's efforts to demonstrate good faith to the Court.

The factors listed in the TCPA are not, as previously noted, all inclusive. The Court can consider any other factor which it deems appropriate. Here, the Court cannot ignore the fact that the jury returned a verdict in defendant's favor on its counterclaim for conversion. In other words, the jury determined that the plaintiffs wrongfully destroyed or withheld personal property of the defendant inconsistent with its claim of title. Consequently, while the Court is of the opinion that the enhancement of damages in this case would serve the purposes of punishment and deterrence as to defendant's conduct, it is also of the opinion that double damages, as opposed to treble damages, would be a more appropriate remedy based on plaintiffs' own wrongful conduct regarding defendant's property. *See Steed Realty v. Oveisi*, 823 S.W.2d 195, 201-02 (Tenn. Ct. App. 1991) (affirming the trial court's award of double damages as opposed to treble damages under the TCPA); *Keith v. Howerton*, 2002 WL 31840683 (Tenn. Ct. App. E.S., filed Dec. 19, 2002) (same); *Brandon v. Winnett*, App.

No. 01A01-9411-CH-00529, 1995 Tenn. App. LEXIS 508 (Tenn. Ct. App. W.S., filed July 28, 1995) (same). Accordingly, the jury's award of $50,456 will be doubled to $100,912.

## II.

### *Motion for Attorney Fees and Costs Pursuant to the TCPA*

Plaintiffs' second motion is based on the following language from the TCPA:

> Upon a finding by the court that a provision of [the TCPA] has been violated, the court may award to the person bringing such action reasonable attorney's fees and costs.

Tenn. Code Ann. § 47-18-109(e)(1). Pursuant to this provision, plaintiffs seek the following:

| | |
|---|---|
| Initial Attorney Fee Request: | $192,381.90 |
| Initial Cost Request: | 16,747.92 |
| Supplemental Attorney Fee Request: | 23,467.50 |
| Total: | $232,597.32 |

In support of their motion, plaintiffs have attached the joint affidavit and a supplemental joint affidavit of their attorneys of record, Jay W. Mader and Mark A. LaMantia [*see* Doc. 175, Ex. 1, and Doc. 196, Ex. 1, respectively]. Additionally, these attorneys have submitted detailed time logs [*see* Doc. 175, Exs. A and C and Doc. 196, Ex. A]. Mr. Mader has also submitted the affidavit of Knoxville attorney William F. Shumate, Jr., in support of his fee request, and Mr. LaMantia has submitted the affidavit of Maryland attorney Harry C. Storm in support of his fee request [*see id.*, Exs. 2 and 3, respectively].

12

Attorneys Shumate and Storm testify that they have reviewed the time records of either Mr. Mader or Mr. LaMantia, respectively, that the hourly rate is reasonable, and that the number of hours expended was necessary in the prosecution of this case [*see id.*].

In response, defendant's first position is, not surprisingly, that plaintiffs are entitled to no attorney fees because of the "token verdict" returned by the jury in this case [*see* Doc. 197, p.2]. Defendant points out that even though plaintiffs sought in excess of $600,000 in compensatory damages and $15 million in punitive damages, the jury awarded them less than eight percent of the compensatory damages sought and an infinitesimal percentage of the aggregate amount of damages sought. Defendant further points out that plaintiffs prevailed on only three of their original fourteen causes of action. Thus, according to defendant, no attorney fees should be awarded.

If, however, the Court is inclined to award a fee, defendant's alternative position is that it should be a fee consistent with the written contingency fee agreement between plaintiffs and their attorneys. Hence, the Court should award a fee of $16,818.67, which would be one-third of the jury verdict of $50,456.

Finally, defendant contends that if the Court is inclined to award a fee greater than a one-third contingency fee, then any such award should only reflect time spent by the attorneys on the three theories on which plaintiffs ultimately prevailed. In an effort to assist the Court in that endeavor, Debra A. Fulton, one of defendant's attorneys of record, has examined in detailed fashion plaintiffs' time records and has coded those time records so that

appropriate deductions may be made as to plaintiffs' unsuccessful theories [*see* Doc. 178 and attachments].

Because the Court has already determined that the defendant's violation of the TCPA was willful and knowing, it naturally follows that an award of attorney fees to plaintiffs' counsel is appropriate. In the Court's view, to reject plaintiffs' request for an attorney fee in this case would result in a gross miscarriage of justice. It has taken plaintiffs nearly a decade to successfully prosecute this case. It is only fitting that an attorney fee - and a sizeable one - should be awarded. To award plaintiffs' counsel one-third of the jury verdict would likewise work an injustice in this case because plaintiffs did not receive a jury verdict commensurate with counsel's efforts, even when that verdict is doubled. Consequently, the Court will determine an award of attorney fees consistent with Tennessee law.

In *Connors v. Connors*, 594 S.W.2d 672 (Tenn. 1980), the Tennessee Supreme Court established the following factors to determine a reasonable attorney's fee:

(1)     the time devoted to performing the legal service;

(2)     the time limitations imposed by the circum-stances;

(3)     the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly;

(4)     the fee customarily charged in the locality for similar legal services;

(5)     the amount involved and the results obtained;  and

(6)     the experience, reputation, and ability of the lawyer performing the legal service.

14

*Id.* at 676. Similarly, the Tenn. Sup. Ct. R. 8, RPC 1.5, sets forth the following factors,

among others, to be considered as guides in determining the reasonableness of a fee:

(1)    The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2)    The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3)    The fee customarily charged in the locality for similar legal services;

(4)    The amount involved and the results obtained;

(5)    The time limitations imposed by the client or by the circumstances;

(6)    The nature and the length of the professional relationship with the client;

(7)    The experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)    Whether the fee is fixed or contingent.[6]

. . .

Ultimately, the reasonableness of an attorney's fee will depend upon the particular

circumstances of the individual case, as considered in light of the relevant guidelines. *White

v. McBride*, 937 S.W.2d 796, 800 (Tenn. 1996). "A fee is clearly excessive if 'after review

of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction

---

[6]With respect to this factor, the Tennessee Supreme Court has observed that "[a]n attorney's fee should be greater where it is contingent than where it is fixed." *United Med. Corp. of Tenn. v. Hohenwald Bank & Trust Co.*, 703 S.W.2d 133, 136 (Tenn. 1986).

that the fee is in excess of a reasonable fee.'" *Fell v. Rambo*, 36 S.W.3d 837, 852 (Tenn. Ct. App. 2000) (quoting Tenn. S. Ct. R. 8, DR 2-106(B)).

The primary thrust of defendant's argument regarding plaintiffs' fee request is directed to a factor common to both the *Connors* case and the Tennessee Rules of Professional Conduct - the amount involved and the results obtained. Again, defendant emphasizes that plaintiffs prevailed on only three of their original fourteen theories and that the amount obtained was minuscule in relation to the amount sought. In effect, defendant urges this Court to adopt a proportionality approach, *i.e.*, to limit the attorney fees in proportion to the damages awarded.

The seminal case on the proportionality issue with respect to civil rights actions is *City of Riverside v. Rivera*, 477 U.S. 561 (1986). In *Riverside*, the prevailing plaintiffs recovered a judgment of $33,350 and the Supreme Court affirmed the district court's award of the full amount of attorney fees of $245,000 despite the enormous disparity:

> A rule that limits attorney's fees in civil rights cases to a proportion of the damages awarded would seriously undermine Congress' purpose in enacting § 1988. Congress enacted § 1988 specifically because it found that the private market for legal services failed to provide many victims of civil rights violations with effective access to the judicial process. ... These victims ordinarily cannot afford to purchase legal services at the rates set by the private market. ... Moreover, the contingent fee arrangements that make legal services available to many victims of personal injuries would often not encourage lawyers to accept civil rights cases, which frequently involve substantial expenditures of time and effort but produce only small monetary recoveries.
>
> . . .
>
> A rule of proportionality would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential

16

damages to obtain redress from the courts. This is totally inconsistent with Congress' purpose in enacting § 1988. Congress recognized that private-sector fee arrangements were inadequate to ensure sufficiently vigorous enforcement of civil rights. In order to ensure that lawyers would be willing to represent persons with legitimate civil rights grievances, Congress determined that it would be necessary to compensate lawyers for all time reasonably expended on a case.

477 U.S. at 576-78.

In an unreported decision previously cited, *Keith v. Howerton*, the Tennessee Court

of Appeals firmly embraced the *Riverside* rationale, and soundly rejected the proportionality

approach in a TCPA case as follows:

In determining the amount of fees and expenses to award, the issue is *not* how the fees requested compare to the amounts eventually awarded to the plaintiff; rather, the issue is how the requested fees and expense measure up under DR 2-106 and the applicable case law. Relying on the language of the United States Supreme Court, we have observed that the purpose behind the allowance of attorney's fees in the [TCPA] is to encourage attorneys to take these sort of cases where the recovery may be small and the amount of time expended may be great.

. . .

The [TCPA] was designed to address deceptive and similar practices which the General Assembly determined to be contrary to the public policy of this state. ... In an attempt to discourage these practices and to insure that such practices are rectified when they do exist, the General Assembly sought to encourage legal representation of injured parties, regardless of the amounts of their claims. This objective would be thwarted, especially with respect to small claims, if the proportionality approach were to be adopted. We hold that such an approach is contrary to the public policy embodied in the [TCPA].

*Keith*, 2002 WL 31840683 at *7-8 (emphasis in original).

Based on the above language, this Court likewise concludes that it would not be

appropriate to award attorney fees to plaintiffs based only on the work expended with respect

17

to the three theories upon which they prevailed, *i.e.*, promissory estoppel, breach of contract as orally modified, and violations of the TCPA. This conclusion is reinforced in this case because all of plaintiffs' theories arise from a common core of facts and plaintiffs' basic claim that the defendant wrongfully terminated the lease and contract for Raceway 773. This Court will therefore examine the fee request in light of Tenn. Sup. Ct. R. 8, RPC 1.5.[7]

In considering the factors set forth in RPC 1.5, the first factor is the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly. Here, the time records of plaintiffs' counsel demonstrate that a tremendous amount of time and labor were required in the prosecution of this case. As noted earlier, this case began almost nine years ago before the jury returned a verdict in plaintiffs' favor. Along the way, plaintiffs were compelled to appeal this case to the Sixth Circuit after this Court had entered summary judgment in defendant's favor on all claims.[8] That appeal resulted in a twenty-page published opinion by the Sixth Circuit reversing the decision of this Court with respect to six of plaintiffs' claims. *See Shah*, 338 F.3d at 577. Obviously, a certain amount of skill, talent, and persistence is necessary for counsel to

---

[7]The Court recognizes that the *Keith* court indicated that the applicable case law should be considered; however, the factors set forth in the *Connors* case are subsumed in Tenn. Sup. Ct. R. 8, RPC 1.5. Thus, a separate analysis of the *Connors* factors is not necessary.

[8]The memorandum opinion [Doc. 66] and order [Doc. 67] filed on July 31, 2001, entering summary judgment in favor of defendant and dismissing this case was filed by the Honorable James H. Jarvis, the trial judge previously assigned to this case. The undersigned's involvement with this case began on July 29, 2004, upon reassignment by the Honorable R. Allan Edgar, Chief United States District Judge [*see* Doc. 112].

18

prevail at the appellate level on so many issues. Plaintiffs' attorneys in this case were up to the task.

The second factor is whether the acceptance of this employment will preclude other employment by the lawyer. Again, because of the incredible amount of time which was involved in the prosecution of this case, plaintiffs' counsel would have naturally been restricted in taking other employment which would have interfered with the zealous representation of plaintiffs in this case.

The third factor is the fee customarily charged in the locality for similar legal services. As previously noted, plaintiffs' counsel has submitted the affidavits of two experienced attorneys to testify regarding the reasonableness and necessity of the fee at issue. Those affidavits support a finding that the requested fee is reasonable and necessary.

The fourth factor is the amount involved and the results obtained. It is this factor which defendant attacks most vigorously. As has been previously discussed, defendant points out that the $50,456 verdict which the jury awarded was less than 3% of plaintiffs' only settlement demand, *i.e.*, $1,700,000. Furthermore, according to defendant, the jury's verdict is less than 8% of the compensatory damages sought, *i.e.*, $600,000, and only .003% of the aggregate amount of damages sought, *i.e.*, $15 million punitive and $600,000 compensatory. Nevertheless, the Court finds that plaintiffs' counsel obtained an excellent result for these clients given the proof introduced at trial, and that the amount of requested attorney fees is not disproportionate to the amount of the jury verdict, *i.e.*, a little more than

four times the amount of the original jury verdict or less than three times the now increased verdict.

The fifth factor is the time limitation imposed by either the client or the circumstances. This factor seems to have little impact on this case since it did not involve, for example, some kind of injunctive relief which must be expeditiously obtained.

The sixth factor is the nature and length of the professional relationship with the client. In this case, Mr. Mader has been representing the plaintiffs, according to his time records, since June 1, 1999. Prior to that time, plaintiffs were represented by three other attorneys.[9] Mr. LaMantia has been involved in this litigation since the middle part of 2000. Thus, these attorneys have been involved in this case for many years, and this case has consumed an enormous amount of their time.

The next factor which the Court must consider is the experience, reputation, and ability of the lawyers performing the services. It can hardly be disputed in this case that the attorneys representing plaintiffs have considerable experience, enjoy an outstanding reputation, and have demonstrated exceptional ability in representing their clients.

Finally, the Court must consider whether the fee is fixed or contingent. Here, Mr. Mader represents that he was on a contingent fee from July 2000 to August 2001. Otherwise, both attorneys have been working on an hourly basis. With respect to this point, it must be noted that Mr. Mader is not seeking any compensation for the year during which he was

---

[9]More specifically, plaintiffs were represented by Attorneys Martin, Daskal, and Gunst [*see* Doc. 182, p.1].

working on a contingency fee arrangement. This factor cannot be ignored in the Court's calculus in determining an appropriate fee. This case is somewhat unusual because the Court has before it the time records for defense counsel during the same year in which Mr. Mader seeks no fee [*see* Doc. 70, attachment]. According to the Court's calculations, defense counsel billed their client more than $37,000 in fees during that time. Presumably, plaintiffs' counsel would have invested a similar amount of time in this case. The Court can only surmise, therefore, that defendant is being given a huge break in plaintiffs' pending fee submission.

One other point needs to be made at this juncture. Mr. LaMantia initially agreed to an hourly rate of $225, which reflected a $25 to $50 reduction in his normal hourly rate. He further agreed to an hourly rate of $200 after the appeal of this matter to the Sixth Circuit. Additionally, Mr. LaMantia agreed to bill no more than nine hours a day during this two-week trial. The Court takes judicial notice of the fact that the attorneys for both sides worked considerably more than nine hours each day during the trial of this case. All of the foregoing suggests that plaintiffs' counsel has made certain deductions which contribute to the overall reasonableness of their fee request.

Nevertheless, the Court's review of the fee requests of these two attorneys also suggests that there has been some duplication of effort in the prosecution of this case. This observation is not meant as a criticism of counsels' efforts. Rather, in a case of this magnitude, a certain amount of duplicative effort is inevitable. That being said, the Court is of the opinion that, in fairness to defendant, a small deduction of the overall hours is

21

appropriate. *See Northcross v. Board of Education of Memphis City Schools*, 611 F.2d 624, 636-37 (6th Cir. 1979) (citing *Oliver v. Kalamazoo Board of Education*, 576 F.2d 714 (6th Cir. 1978)). Accordingly, the Court will reduce plaintiffs' counsels' overall fee request by five per cent whereby the request of $215,849.40 will be reduced to $205,056.93.

After carefully reviewing the record in this case and considering the factors set forth in Tenn. Sup. Ct. R. 8, RPC 1.5, the Court concludes that plaintiffs' counsel is entitled to reasonable and necessary fees in the amount of $205,056.93, as well as costs in the amount of $16,747.92.

## III.

### Motion for Judgment as a Matter of Law, or Alternatively, to Amend the Judgment or for a New Trial

In this motion, defendant sets forth a litany of reasons why judgment should be entered by the Court in defendant's favor or to grant defendant a new trial. In support of its motion, the defendant contends that the jury verdict is against the weight of the evidence with respect to the three theories upon which plaintiffs prevailed; that the Court erred in eight respects by allowing certain evidence to be introduced that was improper; that the Court erred in excluding the felony conviction of Joe Simms; that the Court erred in certain aspects of the jury charge which were included; that the Court erred in failing to charge the jury in certain respects; that the Court erred in failing to apply certain Tennessee statutory and case law at the trial of the case; that the Court erred in not granting defendant's motion for a mistrial upon plaintiffs' introduction of evidence of defendant's net worth during the liability

22

phase; and that the Court erred in failing to submit defendant's proposed verdict form to the jury.

As this Court previously noted, no briefs have been filed as to this motion pursuant to this Court's order staying the briefing schedule [*see* Doc. 195]. The Court took that action to allow the parties sufficient time to conclude their scheduled mediation of all post-trial issues [*see id.*]. As previously noted, that mediation was unsuccessful.

Upon further review of this matter, however, the Court is of the opinion that there is no need for further briefing as it would result in an unnecessary use of counsel's time and a needless expenditure of their client's money.[10] Rarely has the Court undertaken the adjudication of a significant motion without briefing. Under the unusual circumstances of this case, this is indeed one of those rare instances in which further briefing is not necessary.

A motion for judgment as a matter of law requires the trial court to determine "whether there was sufficient evidence presented to raise a material issue of fact for the jury." *Monette v. AM-7-7 Baking Co.*, 929 F.2d 276, 280 (6th Cir. 1991). Evidence is sufficient to submit to a jury unless, "when viewed in the light of those inferences most favorable to the non-movant, there is either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable persons could differ." *Id.* Here, however, the court must be careful: "[t]he court should neither weigh the evidence, evaluate the

---

[10]Or, to put it more accurately, it would result in the needless expenditure of defendant's money because the Court would, consistent with its previous pronouncement, order defendant to pay attorney fees for plaintiffs' counsel for the further development of these issues.

credibility of the witnesses, nor substitute its judgment for that of the jury." *Wayne v. Village of Sebring*, 36 F.3d 517, 525 (6th Cir. 1994), *cert. denied*, 514 U.S. 1127 (1995). "Only when it is clear that reasonable people could come to but one conclusion from the evidence should a court grant a motion for directed verdict." *Id.*

A trial court should likewise deny a motion for a new trial pursuant to Fed. R. Civ. P. 59(a) "if the verdict is one that reasonably could be reached, regardless of whether the trial judge might have reached a different conclusion were he the trier of fact." *Id.* A jury's verdict must be affirmed unless the trial court is left with a definite and firm conviction that a mistake resulting in plain injustice has been committed or the verdict is contrary to all reason. *McCurdy v. Montgomery County, Ohio*, 240 F.3d 512, 517 (6th Cir. 2001) (quotations and citation omitted).

With respect to defendant's contentions regarding the jury instruction, the Court notes that the refusal to give a jury instruction is reversible error if: (1) the omitted instruction is a correct statement of the law; (2) the instruction is not substantially covered by other charges; and (3) the failure to give the instruction impairs the requesting party's theory of the case. *Sutkiewicz v. Monroe County Sheriff*, 110 F.3d 352, 361 (6th Cir. 1997). Moreover, the Court must consider whether the instructions viewed as a whole are misleading and thus require a new trial. *Id. See Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1181 (6th Cir. 1983) ("[i]n evaluating the adequacy of jury instructions, they must be taken as a whole").

Applying the above standards to the record in this case, the Court readily concludes that a new trial is not warranted, nor is a verdict in defendant's favor. Further briefing on this issue will not persuade the Court otherwise for two significant reasons. First, this Court is in the unusual posture of having spent considerable judicial resources reviewing this entire record, including pertinent portions of the trial transcript, in order to analyze fully plaintiffs' motions for treble damages and for attorney fees. Second, this Court enjoyed the tremendous benefit of having the Sixth Circuit shape the contours of the evidence to be introduced at the trial in its twenty-page reported decision. *See Shah*, 338 F.3d 557. Normally, a trial court does not receive input from the Sixth Circuit until after a case is tried. The *Shah* decision shaped in large measure many of this Court's evidentiary rulings and its jury charge.

In light of this Court's considerable post-trial review of this case and after considering each of the grounds raised in defendant's motion, the Court is not in the least left with a definite and firm conviction that a mistake has been made. In fact, given the Sixth Circuit's pronouncements in *Shah*, the likelihood of a jury verdict in defendant's favor was highly unlikely. The only real defense to this lawsuit was the thirty-day termination clause which the Sixth Circuit determined as a matter of law would not totally protect the defendant under the circumstances of this case. This Court's rulings with respect to the law, the evidence, and its charge were, with all due respect to defendant, completely consistent with the Sixth Circuit's opinion. Many of the arguments raised in defendant's motion are simply a rehash of its earlier arguments and indicate, to some extent, defendant's continuing resistence to the impact of the *Shah* decision. While the defendant understandably rejects the rationale of

25

*Shah*, it is indeed the controlling law of this circuit and, more significantly, the controlling

law of this case. There is simply nothing that the defendant can articulate in any additional

brief that will change that reality. The jury's verdict is likewise entirely consistent with the

evidence, the law, and the charge. Defendant's motion will be overruled in its entirety.


## IV.


### *Conclusion*

For the reasons foregoing, it is hereby **ORDERED** as follows:

(1)     Plaintiffs' motion to treble the jury's verdict pursuant to the TCPA [Doc. 174]

is hereby **GRANTED** to the extent that the jury's award of $50,456 will be **DOUBLED** to

One Hundred Thousand, Nine Hundred Twelve and 00/100ths Dollars ($100,912);

(2)     Plaintiffs' motion for attorney fees and costs pursuant to the TCPA [Doc. 175]

is hereby **GRANTED** to the extent that plaintiffs are **AWARDED** attorney fees and costs

in the amount of Two Hundred Twenty-One Thousand, Eight Hundred Four and 85/100ths

Dollars ($221,804.85);

(3)     Defendant's motion for judgment as a matter of law or, alternatively, to amend

the judgment or for a new trial [Doc. 193] is hereby **DENIED** in its entirety;  and

(4)     The Clerk is hereby **DIRECTED** to enter a judgment in favor of plaintiffs

against the defendant reflecting the above amounts, to be offset by the jury's verdict in favor

of defendant on its counterclaim for conversion in the amount of Eight Thousand Six

Hundred Forty-Five and 75/100ths Dollars ($8,645.75), for a total judgment of Two Hundred

Thirteen Thousand, One Hundred Fifty-Nine and 10/100ths Dollars ($213,159.10).


        IT IS SO ORDERED.


                                                    s/ Thomas A. Varlan
                                                  UNITED STATES DISTRICT JUDGE